UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
CLARK DODGE ASSET MANAGEMENT, LLC,
JOSEPH V. DIMAURO,

                                 Plaintiffs,                Civ. No. 17 _____

-against-                             COMPLAINT

MICHAEL R. SANDERS, CRAIG R. MARSON,      JURY TRIAL DEMANDED
SALVATORE R. ASTA, KEVIN J. MCCABE, SUSAN
J. HUNTER and 5C CAPITAL MANAGEMENT, LLC,

                              Defendants.
----------------------------------------------------------------------- X

      Plaintiffs Clark Dodge Asset Management, LLC ("CDAM") and Joseph V. DiMauro, for

their complaint against Defendants 5C Capital Management, LLC ("5C Capital"), Michael R.

Sanders, Craig R. Marson, Salvatore R. Asta, Kevin J. McCabe, and Susan J. Hunter, allege upon

information and belief, except statements pertaining to themselves which are alleged upon

knowledge, as follows:

### Nature of the Action

      1. Defendants 5C Capital, Marson and Sanders engaged in a deliberate, conspiratorial

scheme to steal the entire business of CDAM. In short, these Defendants made a corrupt and

calculated decision that it was cheaper to steal CDAM than pay for it.

      2. Defendants Sanders and Marson -- while still employees, agents and fiduciaries of

CDAM -- secretly created and operated 5C Capital, a direct competitor of CDAM, and their

chosen instrument by which to destroy CDAM. In violation of federal and state law, Defendants

Sanders and Marson wrongfully diverted 95% of CDAM's financial advisory clients to 5C

Capital through false statements to CDAM's clients (including false claims that CDAM was

1

going out of business, CDAM would be "rebranded" as 5C Capital, and 5C Capital was the product of a "consolidation" with CDAM).   Defendants raided and pirated the staff of CDAM, including virtually all operations personnel and financial advisors (i.e., defendants and aiders and abettors Salvatore Asta, Kevin McCabe, and Susan Hunter).  Defendants converted assets from CDAM, took client and corporate files, and Defendant Sanders went so far as to drain and close CDAM's account with TD Bank, causing tens of thousands of dollars in damage to CDAM. Defendants Marson and Sanders concealed their illicit activities from CDAM by entering into a secret, back-dated agreement, disengaging from CDAM'S "global relay" email system, and hiding the full extent of their scheme.   Ultimately, Defendants were successfully in stealing the entire business of CDAM, and driving CDAM out of business as a going concern.

3.   This Complaint seeks compensatory damages, statutory damages, punitive damages, attorneys' fees and costs (as provided by statute and contract), and equitable relief including permanent injunctive relief (enjoining the wrongdoing, compelling corrective disclosure, and ordering the dissolution of 5C Capital).   Defendants' unlawful and corrupt scheme to steal CDAM violated the Lanham Act, the Defend Trade Secrets Act of 2016, New York common law, and the New York General Business Law.  Plaintiffs have acted in consummate good faith in seeking to resolve the dispute outside of litigation; however, Defendants Sanders and Marson -- having already stolen and destroyed CDAM -- are unwilling to negotiate, and have even enlisted *CDAM's attorney* to aid and insulate their scheme.  Under the faithless servant doctrine, Plaintiffs also seek the forfeiture of salaries, compensation and bonuses paid to the individual Defendants for the entire period of their conspiracy which -- according to a secret document wrongly backdated by Marson and Sanders -- began on December 15, 2013.  Accordingly, Defendants are jointly and severally liable for carrying out the scheme that destroyed CDAM as

an ongoing enterprise, and are jointly and severally liable for the massive damages inflicted by their illegal scheme.

## The Parties

4.  Plaintiff Clark Dodge Asset Management LLC ("CDAM") was incorporated as a domestic limited liability company under the laws of the State of New York on August 11, 2010. CDAM maintains its principal place of business at 4 Westchester Park Drive, Suite 330, White Plains, NY 10604.  Since its inception, CDAM has offered a full range of wealth management services allowing its clients to consolidate their estate and retirement planning and also manages discretionary investments.  Joseph DiMauro is the CEO and the controlling member of CDAM. Mr. DiMauro provides the accumulated insights of decades of experience in the financial services and energy sectors.

5.  Plaintiff Joseph V. DiMauro is a resident of Armonk, New York and is the CEO and controlling member of CDAM.

6.  Defendant 5C Capital Management, LLC ("5C Capital") was incorporated as a limited liability company under the laws of the State of Delaware on May 10, 2016.   It is a Registered Investment Adviser with offices in Woodcliff Lake, NJ, NYC, and Mount Pleasant, South Carolina.

7.  Defendant Michael R. Sanders resides at 25 Wampus Avenue, Armonk, New York 10504.  He was an employee, fiduciary and agent of CDAM in White Plains, NY from July 11, 2011 to March 3, 2017.  On the same day he left CDAM -- March 3, 2017-- Sanders registered as an investment adviser with 5C Capital.

8.  Defendant Craig R. Marson resides at 7 Cricket Lane, Woodcliff Lake, New Jersey. He was an employee, fiduciary and agent with CDAM in White Plains, NY from July 11, 2013

to February 7, 2017.  On the same day he left CDAM -- February 7, 2017 -- Marson registered as an investment adviser with 5C Capital.

9.     Defendant Salvatore R. Asta was an employee, fiduciary and agent of CDAM in White Plains, NY from November 2001 to March 2017.   Upon information and belief, Salvatore R. Asta joined 5C Capital in or about March 2017; however, his FINRA registration records state that he is unregistered.

10.    Defendant Susan J. Hunter was an employee, fiduciary and agent of CDAM in White Plains, NY from July 18, 2011 through June 1, 2017, according to FINRA records.  According to the same FINRA records, however, Ms. Hunter was registered with 5C Capital on or about March 16, 2017, in 5C Capital's so-called branch office in Mount Pleasant, South Carolina.

11.    Defendant Kevin J. McCabe was an employee, fiduciary and agent of CDAM in White Plains, NY from March 3, 2015 through June 1, 2017, according to FINRA records. According to the same FINRA records, however, Mr. McCabe registered with 5C Capital on or about April 18, 2017.

## Jurisdiction and Venue

12.    This Court has original jurisdiction over the subject matter of this action pursuant 28 U.S.C. §1331 and §1338(a).  This Court has supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to Plaintiffs' claims under the Lanham Act and the Defend Trade Secrets Act of 2016 that they form part of the same case or controversy.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events or omissions giving rise to the claims occurred in this District.  A substantial part of

property that is the subject of the action is situated in this District.   Plaintiffs CDAM and DiMauro, and Defendant Sanders, are residents in this District.

## Background

### A. **Formation and Governance of Clark Dodge Asset Management, LLC**

14. On or about August 11, 2010, Joseph V. DiMauro formed CDAM as a limited liability company under the laws of the State of New York.

15.  On August 12, 2010, Joseph DiMauro and Michael Sanders entered into the Limited Liability Company Agreement of Clark Dodge Asset Management LLC, a New York Limited Liability Company" ("LLC Agreement").   At the time of the commencement of this action, Plaintiff Mr. DiMauro is CEO of CDAM and owns 70% of the equity of CDAM.

16.  The LLC Agreement was entered into under and pursuant to the authority of the New York Limited Liability Law.   Under New York law, LLC members owe each other the traditional fiduciary duties that directors owe a corporation including the traditional fiduciary duties of undivided loyalty and care to the members of the LLC.   Pursuant to Limited Liability Company Law § 409(a): "a manager shall perform his or her duties as a manager * * * in good faith and with that degree of care that an ordinary prudent person in a like position would use under similar circumstances."

17.  The Members of CDAM (Plaintiff DiMauro and Defendant Sanders) entered into the LLC Agreement "in order to govern the affairs of the Company and set forth their rights, obligations and understandings with respect to the Company."  LLC Agreement at 1.   Section 3.6(a) of the LLC Agreement provides that "all decisions regarding the day-to-day management of [CDAM] shall be made by [both] Governing Members" absent an express delegation of authority.   The LLC Agreement strictly prohibits the Members from disclosing disclosure of

"secret and confidential information which relates to or affects the business and affairs of [CDAM]" and each Member agrees that any breach of confidentiality would "irreparably injure" CDAM, and that "[CDAM] in addition to pursuing any other remedies it may have in law or equity against a Member of Representative who violates these covenants, may seek an injunction against such Member or Representative from any court having jurisdiction over the matter restraining any further violation of this Section 5.1." LLC Agreement § 5.1.   The LLC Agreement also imposes upon Defendant Sanders a protocol for his withdrawal from CDAM, and provides that if Sanders does not follow that protocol, he forfeits any claim to distribution of cash or assets from CDAM.  LLC Agreement § 6.5.  The LLC Agreement is governed by New York law.   LLC Agreement § 8.12. The LLC Agreement provides that "in any action or proceeding to enforce any provision of this Agreement . . . the successful party shall be entitled to recover reasonable attorneys' fees in addition to any other available remedy."   LLC Agreement § 8.9.

**B**.   **Defendants' Scheme to Steal the Business, Assets and Property of CDAM**

18.   In 2016, while employed by and fiduciaries with CDAM, Defendants Sanders and Marson embarked upon a deliberate conspiratorial scheme to steal the business of CDAM and drive CDAM out of business as an independent entity.

**5C Capital is Incorporated in Delaware Through a Shroud of Secrecy**

19.   On May 10, 2016, Defendants Marson and Sanders laid the foundation for their scheme by establishing 5C Capital Management, LLC as a limited liability company under the laws of the State of Delaware.  This act was designed to create the corporate vehicle into which Defendants Sanders  and Marson would transfer and transition the assets, clients and property of CDAM.   The Delaware LLC corporate form allows for the anonymity of its members.

**Sanders and Marson Launch 5C While Still Registered With CDAM**

20.  Defendants Sanders and Marson took steps to launch and operate 5C Capital in June 2016, while both were still employees, fiduciaries and agents with CDAM.  According to the public filings of 5C Capital, Defendants Sanders and Marson are equal, 50-50% owners of 5C Capital.  According to the public filings of 5C Capital, as of June 2016, Defendant Marson assumed the "status" of and acted as "CCO [Chief Compliance Officer], Principal, Director of Financial Planning" for 5C Capital, and Defendant Sanders assumed the "status" of and acted as "Principal, Chief Investment Officer" for 5C Capital.  At the time Defendants assumed and performed these senior management positions with 5C Capital, they were both registered with and fiduciaries of CDAM.  Defendants kept these actions secret from CDAM.

**5C Capital is Registered in New York Based on a Deceptive Statement**

21.  Defendants 5C Capital, Sanders and Marson took steps to conceal their scheme.  For example, on July 19, 2016, Defendants 5C Capital, Sanders and Marson caused 5C Capital Management, LLC to be registered with the New York Department of State (Division of Corporations) as a foreign limited liability company. In an effort to conceal Sanders' participation in the scheme, Defendants 5C Capital, Sanders and Marson represented to the New York Secretary of State that service of process for 5C Capital should be made upon:

C/O CRAIG R. MARSON

25 WAMPUS AVENUE

ARMONK, NEW YORK, 10504

In fact, however, Defendant Marson did not reside in Armonk, as represented to the State of New York.  The address listed -- 25 Wampus Avenue, Armonk, New York 10504 -- was and is the residence of Defendant Sanders.   Defendants kept this action secret from CDAM.

### Registration of 5C Capital with the SEC

22.   On January 4, 2017, 5C Capital received approval from the Securities Exchange Commission as a "newly formed advisor."   Defendants kept this action secret from CDAM.

### Marson and Sanders Leave CDAM

23.   On or about February 7, 2017, Defendant Marson left CDAM and on the same day – February 7, 2017 -- registered as an investment adviser with 5C Capital.  On or about March 3, 2017, Defendant Sanders left CDAM and on the same day – March 3, 2017 – registered as an investment adviser with 5C Capital.

### Defendants' Fraudulent Diversion of Clients

24.   Defendants 5C Capital, Sanders and Marson have used deceptive solicitation techniques to convince CDAM's clients that 5C Capital is functionally the same company as CDAM, by, *inter alia*, directly telling CDAM's clients and others that 5C Capital is a "rebranded" version of CDAM, that the advisory business and staff of CDAM is now the "advisory business and staff" of 5C Capital, and there has been a "consolidation" of ownership leading to the creation of 5C Capital.   In this manner, Defendants falsely designated the origin of their services.

25. Defend ants Sanders, Marson and 5C Capital also schemed to alienate CDAM's clients from CDAM and divert CDAM's clients to 5C Capital. Through telephonic, electronic and/or face-to-face communications with CDAM's clientele and others throughout January and early February 2017, defendants Marson and Sanders falsely stated that CDAM was going out of business. They announced their imminent departure from CDAM, while falsely stating that the controlling member and CEO of CDAM, Joseph DiMauro, was "retiring." They falsely stated that CDAM would be "rebranded" and continue as 5C Capital.  They falsely stated that the

"rebranding" of CDAM as 5C Capital had the support and approval of Joseph DiMauro. On the basis of these false, fraudulent and disparaging statements, 95% of CDAM's clients left CDAM for 5C Capital.

### Misleading Public Announcement of the Formation of 5C Capital

26.  On or about February 10, 2017, defendants 5C Capital, Sanders and Marson publicly announced the formation of 5C Capital.  This was done even though Sanders was still an employee, fiduciary and agent of CDAM as of February 10, 2017. According to public filings of 5C Capital dated February 10, 2017, 5C Capital represented that its "Management and Team" included "Michael R. Sanders Principal and Chief Investment Officer, 5C Capital Management, LLC" and "Craig R. Marson CCO [Chief Compliance Officer], Principal and Director of Financial Planning, 5C Capital Management, LLC."

27.  On or about February 10, 2017, Defendants 5C Capital, Marson, and Sanders caused an announcement to appear on the public website of 5C Capital, which stated, in part:

> We are pleased to announce the formation of 5C Capital Management, LLC and the immediate transition of our advisory business and staff to the new firm.

> We are fortunate that our business has grown steadily during a time of great change.  It became necessary to consolidate ownership of the firm in order to preserve and grow the practice in accordance with the high standards of investment process and planning services that you are entitled to.

Website of 5C Capital (last visited July 19, 2017).  This public announcement was and is false and misleading. The public announcement made references to "our advisory business and staff" when, in fact, it was the advisory business and staff of CDAM that was diverted to and formed the basis of 5C Capital.  The public announcement was false and fraudulent because there was no "consolidation of ownership" between CDAM and 5C Capital, but rather, CDAM has been stolen by Defendants, without the authorization of its CEO and controlling member, Joseph

DiMauro.   Just as there was no "rebranding" of CDAM, there was no "transition" of the "advisory business and staff" from CDAM to 5C Capital.  It was deceptive and fraudulent for the Defendants to claim that 5C Capital was functionally the same entity as the CDAM "advisory business and staff" that had "grown steadily."

28.   On or about February 10, 2017, in a letter to clients and others published electronically, Defendants Sanders, Marson, and 5C Capital repeated their fraudulent story that 5C Capital was merely a rebranded and consolidated version of CDAM.   The letter, dated "February 2017" states, in part:

> We are pleased to announce the formation of 5C Capital Management, LLC and the immediate transition of our advisory business and staff to the new firm.

> We are fortunate that our business has grown steadily during a time of great change. It became necessary to consolidate ownership of the firm in order to preserve and grow the practice in accordance with the high standards of investment process and planning services that you are entitled to.

> \* \* \*

> 5C will maintain offices in New York and New Jersey; we endeavor to transition your accounts as seamlessly as possible.   During this period, there will be no change to your accounts, your dedicated team nor service interruption from our custodians.  Your fee structure will remain the same.

Letter of 5C Capital, Sanders and Marson, Published on the website of 5C Capital (last visited July 19, 2017).  This letter was and is false and misleading. The letter makes references to "our advisory business and staff" when, in fact, it was the advisory business and staff of CDAM that is being palmed off as 5C Capital.  The public announcement was false and fraudulent because there was no "consolidation of ownership" between CDAM and 5C Capital, but rather, CDAM has been stolen by Defendants, without the authorization of its CEO and controlling member, Joseph DiMauro. Just as there was no "rebranding" of CDAM, there was no "transition" of the advisory business from  CDAM  to  5C Capital.   It was  deceptive  and  fraudulent  for  the

Defendants to claim that 5C Capital was functionally the same entity as the CDAM "advisory business and staff" that had "growth steadily."

### Sanders and Marson Defraud CDAM through a Back-Dated Contract

29.     For much of his time at CDAM, Defendant Marson refused to enter into an employment contract with CDAM.  When faced with a Department of Labor audit, however, Sanders and Marson entered into the so-called "Service and Compensation Agreement between Clark Dodge Asset Management, LLC ("CDAM"), Michael Sanders ("MS"), President and Craig R. Marson ("CRM", currently Managing Director and Director of Financial Planning for CDAM" (the "Marson/Sanders Agreement").  The Marson/Sanders Agreement covered "April 2013 – March 31, 2014" but Defendants Marson and Sanders personally back-dated the contract in their own handwriting as of "12-15-2013."   The Marson/Sanders Agreement was not authorized by CEO DiMauro, and it was not disclosed to CEO DiMauro by either Marson or Sanders at or before the time of its execution. The Defendants' concealment of the Marson/Sanders Agreement prevented CDAM from uncovering the full scope of the wrongdoing committed by 5C Capital, Marson, and Sanders.

30.  The Marson/Sanders Agreement was an act of self-dealing by Marson and Sanders. For example, the Marson/Sanders Agreement does not contain any of the usual post-employment restrictions or confidentiality provisions in an employment contract in the securities industry. The Marson/Sanders Agreement is thus an overt act of self-dealing designed by Defendants Marson and Sanders in their scheme to lay the groundwork for Marson's departure from CDAM, and their effort to drive CDAM out of business for their own personal benefit.  Under New York common law, this conduct violates the faithless servant doctrine, and compels the forfeiture of all

salary and compensation paid to Marson and Sanders from the first act of disloyalty, which Defendants designate as "12-15-2013."

## Defendants' Illegal Raid on CDAM

31. As part of their illicit scheme to steal the business of CDAM, Defendants 5C Capital, Sanders and Marson raided the staff of CDAM. They falsely told CDAM's staff that CDAM was going out of business, and would continue only in "rebranded" form as 5C Capital, and through such deceptive solicitations, caused CDAM's financial advisors (defendants and co-conspirators Asta, McCabe and Hunter) and CDAM's operations staff, to leave CDAM for 5C Capital.

## Defendants' Conversion of Property and Assets

32. Acting for themselves and 5C Capital, Defendants Sanders and Marson converted property and assets of CDAM, including but not limited to client files, goodwill and other assets and property belonging to CDAM. To establish and support 5C Capital, Defendants used CDAM funds to pay their personal attorney. Defendant Sanders' bad faith was demonstrated by his clandestine and malicious removal and/or destruction of CDAM's files, including confidential dossiers, clients' confidential information and other CDAM office documents, including all meeting minutes and conference documents.

## Defendant Sanders' Theft of Company Funds

33. Based upon a preliminary accounting of funds disbursed by Defendant Sanders from CDAM's checking account with TD Bank, Defendant Sanders defrauded CDAM of vast sums of money, by writing unauthorized checks on the TD account to himself for his personal benefit and the benefit of 5C Capital, including but not limited to:

1. November 7, 2013: Direct Payment of $2,000 from Defendant Sanders to Defendant Sanders.

2. January 29, 2014:  Direct Payment of $5,000 from Defendant Sanders to Defendant Sanders.

3. June 20, 2014:     Direct Payment of $750.00 from Defendant Sanders to Defendant Sanders.

4. August 12, 2014:     Direct Payment of $4,000 from Defendant Sanders to Defendant Sanders.

5. Dec. 15, 2014:     Direct Payment of $2,000 from Defendant Sanders to Defendant Sanders.

6. May 5, 2015:     Direct Payment of $7,500 from Defendant Sanders to Defendant Sanders.

7. July 2, 2015:     Direct Payment of $1,500 from Defendant Sanders to Defendant Sanders.

8. Oct. 28, 2016:     Direct Payment of $12,500 from Defendant Sanders to Defendant Sanders.

9. Jan. 17, 2017:     Direct Payment of $9,000 from Defendant Sanders to Defendant Sanders.

Defendant Sanders misappropriated and converted tens of thousands of dollars, as specified above, despite the fact that he had already established 5C Capital and was acting as "Principal, Chief Investment Officer" for 5C Capital.

34.  Based upon a preliminary accounting of funds disbursed by Defendant Sanders from CDAM's checking account with Chase, Defendant Sanders defrauded CDAM of vast sums of money.

## Bad Faith Tactics By Defendant Sanders

35.  In early 2017, Defendant Sanders told CEO DiMauro of his plan to leave CDAM. To avoid any dispute, and protect CDAM clients, Plaintiff Joseph DiMauro requested that there be a meeting with Defendant Sanders for the purpose of discussing an orderly, amicable, peaceful transition.  Sanders did not acknowledge or reply to CEO DiMauro's email requests. Instead, over the course of several months, Defendant Sanders declined to resolve the dispute or enter into an appropriate separation agreement that would have obviated this litigation.  He decided to leave CDAM without any resolution of the dispute that he and his co-conspirators chose to create.

36**.**    On March 3, 2017, Defendant Sanders announced by email to CDAM's CEO DiMauro that Defendant Sanders he had unilaterally closed CDAM's TD account and deposited the balance to Chase. Defendant Sanders further stated that he used the U.S. mails to cause the

deposit slip to be mailed to the offices of CDAM.  Mr. DiMauro immediately objected to the self-dealing and unauthorized transactions and told Defendant Sanders that he should not have closed the TD Bank account.  Defendant Sanders did not reply to Mr. DiMauro. This unauthorized closure of the TD Bank account caused substantial damage to CDAM.

### FIRST CLAIM FOR RELIEF

### (Lanham Act Violations: False Designation of Origin)

### (Defendants 5C Capital and Marson)

37.  Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 36 above.

38.  Defendants 5C Capital and Marson violated the Lanham Act, which proscribes any false and misleading representations about the nature, characteristics, qualities or geographic origin of any person's goods, services or commercial activities.

39.  Defendants 5C Capital and Marson made false, or caused to be made, deceptive and misleading factual representations about the nature, characteristics, and qualities of CDAM's goods, services and commercial activities.  Defendants falsely told CDAM's clients and others, on repeated occasions throughout January and February 2017 (and continuing through today), that:

> (i) 5C Capital was the same as CDAM;
>
> (ii) CDAM was to be "rebranded" as 5C Capital;
>
> (iii) CDAM's "advisory business and staff" was moved to 5C Capital;
>
> (iv) 5C Capital was the "consolidation" of CDAM and 5C Capital; and
>
> (v) 5C Capital was a "transition" of CDAM to 5C Capital.

40.  These false and deceptive statements, considered individually or collectively, were made in bad faith and misled CDAM's clients and the public at large about the origin of the

services provided and to be provided by 5C Capital, caused CDAM's clients and professional staff to leave CDAM for 5C Capital, and damaged Plaintiff CDAM, including through the complete destruction of CDAM as an ongoing enterprise.

41.  As a direct and proximate result of Defendants' violation of the Lanham Act, CDAM was damaged in the amount of the full value of CDAM as a going concern; damage to goodwill and reputation; Marson's salary and compensation paid during the entire period of scheme (which commenced no later than December 15, 2013); and lost profits of CDAM.  Plaintiff seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000. Defendants' wrongdoing caused irreparable harm to CDAM, including but not limited to the destruction of CDAM as a going concern.   This is an exceptional case under the Lanham Act and Plaintiff seeks statutory damages and attorneys' fees for this action.  Plaintiff CDAM seeks permanent injunctive relief to: (a) enjoin Defendants from engaging in or reaping the benefits of their acts in violation of the Lanham Act; (b) order corrective disclosure that 5C Capital is not a "rebranded" version of CDAM; and (c) order the dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

42.  Plaintiff CDAM also seeks punitive damages under this claim.  Punitive damages should be awarded to Plaintiff because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.  This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendants deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it

was cheaper to steal CDAM than pay for it.   Accordingly, Plaintiff CDAM seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## SECOND CLAIM FOR RELIEF

## (Lanham Act Violations)

## (False, Misleading and Disparaging Statements About CDAM and Mr. DiMauro)

## (Defendants 5C Capital and Marson)

43.   Plaintiffs CDAM and DiMauro repeat and reallege each and every allegation in paragraphs 1 through 42 above.

44.   Defendants 5C Capital and Marson violated the Lanham Act, which proscribes any false and misleading representations about the nature, characteristics, qualities or geographic origin of any person's goods, services or commercial activities.

45.   Defendants 5C Capital, Marson and Sanders made, or caused to be made, false, deceptive and misleading factual representations about the nature, characteristics, and qualities of CDAM's goods, services and commercial activities, and the status of CDAM's CEO and controlling member, Plaintiff DiMauro. Specifically, Defendants made or caused to be made false, misleading and disparaging statements about the services, goods and commercial activities of CDAM and Mr. DiMauro to CDAM's clients and the public at large throughout January and February 2017 (and continuing today), including:

(a)  Defendants falsely told CDAM's clients and the public at large that CDAM would cease operations in its own name and would only continue, in "rebranded" form, as 5C Capital.

(b)  Defendants falsely told CDAM's clients and others that CDAM's CEO and controlling member, Joseph DiMauro, would be "retiring" from his position as CEO of CDAM.

16

(c)   Defendants falsely told CDAM's clients and others that 5C Capital was formed with the approval of CDAM's CEO and controlling member, Joseph DiMauro; and

(d) Defendants falsely told CDAM's clients and others that it was "necessary" to "consolidate ownership" to "preserve" the advisory business.

46.   These false and deceptive statements, considered individually or collectively, were made in bad faith and misled CDAM's clients and the public at large, caused CDAM's clients and its professional/operations staff to leave CDAM for 5C Capital, and damaged Plaintiff CDAM, including through the destruction of CDAM as an ongoing enterprise.

47. Defendants used their false or misleading representations "in commerce" on or in connection with their services. For example, Defendants' false, misleading and disparaging statements concerning CDAM's services, goods, and commercial activities were widely disseminated by Defendants through electronic, telephonic and written communications to clients and others, including through the website of 5C Capital.

48.   Defendants made their false , misleadin g and disparaging r epresentations in the context of commercial advertising or commercial promotion, including by publication of misrepresentations on the website of 5C Capital, a quintessential commercial advertising, marketing and promotion vehicle.

49.   Plaintiffs CDAM and Joseph DiMauro were damaged by the Defendants' false, misleading and disparaging factual representations, including by harm to reputation and goodwill, and the destruction of CDAM as an ongoing enterprise.

50.   As a direct and proximate result of Defendants' violation of the Lanham Act, CDAM was damaged in the amount of the full value of CDAM as a going concern; damage to goodwill and reputation; Marson's salary and compensation paid during the entire period of

scheme (which commenced no later than December 15, 2013); and lost profits of CDAM. Plaintiff seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000. Defendants' wrongdoing caused irreparable harm to CDAM, including but not limited to the destruction of CDAM as a going concern. This is an exceptional case under the Lanham Act and Plaintiffs seek statutory damages and attorneys' fees for this action. Plaintiffs seek permanent injunctive relief to: (a) enjoin Defendants from engaging in or reaping the benefits of their acts in violation of the Lanham Act; (b) enjoin Defendants from making or publishing false and misleading representations about the nature, characteristics, qualities or geographic origin of CDAM's goods, services or commercial activities; (c) order corrective disclosure retracting their false and misleading representations about CDAM and its business and principal; and (d) order the dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

51. Plaintiffs CDAM and Joseph DiMauro also seek punitive damages under this claim. Punitive damages should be awarded to Plaintiffs because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM and Joseph DiMauro. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendants deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it. Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

### THIRD CLAIM FOR RELIEF

### (Violation of the Defend Trade Secrets Act of 2016)

### (Defendants 5C Capital and Marson)

52.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 51 above as if fully set forth herein.

53.   On May 11, 2016, President Obama signed the Defend Trade Secrets Act (DTSA) into law.  This enactment creates a federal, private, civil cause of action for trade-secret misappropriation in which an owner of a trade secret that is misappropriated may bring a civil action and seek broad remedies if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. (Pub.L. 114–153, 130 Stat. 376, enacted May 11, 2016, codified at 18 U.S.C. § 1836, *et seq.*).

54.   CDAM was and is the owner of trade secrets -- which were and are related to a product or service used in, or intended for use in, interstate or foreign commerce -- that have been misappropriated by Defendants.  Under the DTSA, "trade secrets" encompass "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as the owner of the trade secret takes reasonable measures to keep the information secret and the information is valuable because it is not generally known or readily ascertainable through legitimate means. CDAM's trade secrets include financial, business, technical, and economic information which relates to or affects the internal business and affairs of CDAM.  CDAM's trade secrets exist in written and electronic form, and include client dossiers, methodologies of trading and financial advisory services, and marketing plans, that have been formulated by CDAM through the expenditure of great time and expense.   CDAM invested significant financial and other resources in its development of its highly confidential trading and financial advisory

methodologies, as well as business and marketing plans.   The CDAM trade secrets at issue are valuable, not generally known, and are not readily ascertainable through legitimate means.

55. Defendants violated the DTSA.  They willfully and maliciously misappropriated the trade secrets of CDAM though improper means, including the breach or inducement of a breach of a duty to maintain secrecy.  Defendant Marson was a senior manager of CDAM and he knew, or should have known, that their acquisition of CDAM's confidential and secret information was the consequence of his own breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use.  He took, or caused to be taken, confidential and secret information to enable his diversion of the entire business of CDAM to 5C Capital (while driving CDAM out of business), for his own direct competitive advantage in managing the CDAM advisory business that would become the core of 5C Capital.  This is the very sort of willful and malicious conduct that the DTSA was designed to remedy and deter.

56. CDAM diligently protects its trade secrets through contracts and otherwise.  As Defendants know or should know, Plaintiff CDAM has taken reasonable measures to protect its trade secrets, including through the LLC Agreement. The LLC Agreement imposes a strict prohibition on the disclosure of "secret and confidential information which relates to or affects the business and affairs of [CDAM]" and each Member agrees that any breach of confidentiality would "irreparably injure" CDAM, and that "[CDAM] in addition to pursuing any other remedies it may have in law or equity against a Member of Representative who violates these covenants, may seek an injunction against such Member or Representative from any court having jurisdiction over the matter restraining any further violation of this Section 5.1."

57.   CDAM's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

58.   Defendants continue to use the trade secrets of CDAM without authorization and in violation of the DTSA.

59.   Plaintiff CDAM has been damaged by Defendants' violations of the DTSA and seeks compensatory damages in an amount to be determined at trial but believed to exceed $10,000,000; exemplary damages (two times the amount of compensatory damages); and attorneys' fees and costs.   Plaintiff CDAM seeks permanent injunctive relief to: (a) enjoin Defendants from their continued use of CDAM's trade secrets; (b) enjoin Defendants from engaging in or reaping the benefits of their acts in violation of the DTSA; and (c) order the dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

60.   Plaintiff CDAM also seeks punitive damages under this claim.   Punitive damages should be awarded to Plaintiff because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.   This wrongdoing included a massive fraud on the public.   The evidence at trial will show that Defendants deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.   Accordingly, Plaintiff CDAM seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

**FOURTH CLAIM FOR RELIEF**

**(Breach of Contract – LLC Agreement)**

**(Defendant Sanders)**

61.  Plaintiffs CDAM and Joseph DiMauro repeat and reallege each and every allegation in paragraphs 1 through 60 above as if set forth fully herein.

62.  On August 12, 2010, Joseph DiMauro and Michael Sanders entered into the Limited Liability Company Agreement of Clark Dodge Asset Management LLC, a New York Limited Liability Company" ("LLC Agreement").

63. Joseph DiMauro and CDAM have performed any and all obligations under the LLC Agreement.

64.  The LLC Agreement was entered into under and pursuant to the authority of the New York Limited Liability Law.   Under New York law, LLC members owe each other the traditional fiduciary duties that directors owe a corporation including the traditional fiduciary duties of undivided loyalty and care to the members of the LLC.  Pursuant to Limited Liability Company Law § 409(a): "a manager shall perform his or her duties as a manager * * * in good faith and with that degree of care that an ordinary prudent person in a like position would use under similar circumstances."

65.   The LLC Agreement also includes an implied covenant of good faith and fair dealing.  Under the contractual covenant of good faith and fair dealing, Sanders was obligated to use his "best efforts" in the performance of his duties as a Member of the LLC.  Moreover, the contractual covenant embraces a pledge that Sanders shall not do anything which will have the effect of destroying or injuring the rights of Plaintiffs to receive the fruits of the LLC Agreement.

66.  Defendant Sanders breached the LLC Agreement by, *inter alia*:

(a) engaging in a conspiratorial scheme to divert the entire business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit, including by falsely representing to CDAM's clients and the public at large that CDAM was going out of business; CDAM would continue in "rebranded" form as 5C Capital; and Plaintiff Joseph DiMauro was "retiring." Those deceptive statements caused 95% of CDAM clients and most of CDAM's operations staff to leave CDAM for 5C Capital.

(b) establishing and operating a competing business, 5C Capital, while still employed and registered with CDAM;

(c) raiding the professional and operations staff of CDAM, and diverting the professional/operations staff to 5C Capital;

(d) misappropriating and converting money from CDAM, including tens of thousands of dollars in payments to himself through checks drawn on the CDAC account at TD Bank;

(e) misappropriating and converting money from CDAM for the purpose of establishing his competing business -- 5C Capital -- including the payment of personal attorneys.

(f) converting the assets of CDAM, including client files, trade secrets, and confidential and secret information, delivering or causing the delivery of those assets to 5C Capital, and using those assets to the competitive disadvantage of CDAM and for his personal benefit;

(g) concealing and enabling his misconduct by, *inter alia*: (i) forming an anonymous LLC in Delaware; (ii) entering into a secret, back-dated agreement (Marson/Sanders Agreement) without authorization; (iii) registering 5C Capital as a foreign LLC in NY, while concealing his name from the registration that used his personal address; and (iv) disengaging from the CDAM email system (global entry system);

23

(h) engaging in bad faith discussions, aided by CDAM's lawyer, leading up to his departure from CDAM on March 3, 2017, which  allowed Defendant Sanders to conceal and execute his scheme to destroy CDAM and divert CDAM's business and staff to 5C Capital, of which Sanders is a 50% owner;

(i) failing to comply with the LLC Agreement's requirements governing his decision to withdraw from CDAM; and

(j) negotiating and executing a secret agreement with Defendant Marson – the Marson/Sanders Agreement -- which served only the common interest of Marson and Sanders, conflicted with the interest CDAM, and sought to open the door to allow Marson to leave CDAM at will to establish the competing business of 5C Capital, in which Sanders and Marson would be 50-50% owners.

67. Defendant Sanders' breach of contract was done for his own benefit, and the benefit of Defendant 5C Capital, which is legally liable for the actions of Sanders under the doctrine of *respondeat superior*.

68. As a direct and proximate result of Defendant Sanders' breach of contract, CDAM and Joseph DiMauro were damaged in the amount of the full value of CDAM as a going concern; damage to goodwill and reputation; Sanders' salary and compensation paid during the entire period of breach of contract (which commenced no later than December 15, 2013); the full value of the funds converted by Sanders; and lost profits of CDAM.  Plaintiffs seek damages in an amount to be determined at trial, but believed to exceed $10,000,000.  Defendant Sanders' breach of contract caused irreparable harm to Plaintiffs CDAM and DiMauro, including but not limited to the destruction of CDAM as a going concern.  Plaintiffs seek damages, in an amount to be determined at trial, but believed to be not less than $10,000,000, including the forfeiture of

all compensation paid by CDAM to Sanders from the date of his first act in breach of the LLC Agreement, which is believed to be no later than December 15, 2013. Plaintiffs also seek attorneys' fees and costs pursuant to Section 8.9 of the LLC Agreement.

69.     Plaintiffs also seek punitive damages under this claim.   Under New York law, punitive damages should be awarded to Plaintiffs CDAM and Joseph DiMauro because Defendant has committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM and Joseph DiMauro. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendant deliberately and maliciously sought to destroy CDAM for his own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it. Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## FIFTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Under the LLC Agreement)

### (Defendant Sanders)

70. Plaintiffs CDAM and DiMauro repeat and reallege each and every allegation in paragraphs 1 through 69 above as if set forth fully herein.

71.   Under New York law, LLC members owe each other the traditional fiduciary duties that directors owe a corporation including the traditional fiduciary duties of undivided loyalty and care to the members of the LLC. Pursuant to Limited Liability Company Law § 409(a): "a manager shall perform his or her duties as a manager * * * in good faith and with that degree of care that an ordinary prudent person in a like position would use under similar circumstances."

72.   Under the LLC Agreement, Defendant Sanders owed CDAM, and co-member DiMauro, the duties of undivided loyalty, care, and good faith as a matter of contract.

73.   In violation of the LLC Agreement, Defendant Sanders violated, and continues to violate, his fiduciary duties to Plaintiffs CDAM and DiMauro by, *inter alia*:

(a) engaging in a conspiratorial scheme to divert the entire business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit, including by falsely representing to CDAM's clients and the public at large that CDAM was going out of business; CDAM would continue in "rebranded" form as 5C Capital; and Plaintiff Joseph DiMauro was "retiring." Those deceptive statements caused 95% of CDAM clients and most of CDAM's operations staff to leave CDAM for 5C Capital;

(b) establishing and operating a competing business, 5C Capital;

(c) raiding the professional and operations staff of CDAM, and diverting the professional/operations staff to 5C Capital;

(d) misappropriating and converting money from CDAM, including tens of thousands of dollars in payments to himself through checks drawn on the CDAC account at TD Bank;

(e) misappropriating and converting money from CDAM for the purpose of establishing his competing business -- 5C Capital -- including the payment of personal attorneys;

(f) converting the assets of CDAM, including client files, trade secrets, and confidential and secret information, delivering or causing the delivery of those assets to 5C Capital, and using those assets to the competitive disadvantage of CDAM and for his personal benefit;

(g) concealing and enabling his misconduct by, *inter alia*, (i) forming an anonymous LLC in Delaware; (ii) entering into a secret, back-dated agreement (Marson/Sanders Agreement) without authorization; (iii) registering 5C Capital as a foreign LLC in NY, while concealing his

name from the registration that used his personal address; and (iv) disengaging from the CDAM email system (global entry system);

(h) engaging in bad faith discussions, aided by CDAM's lawyer, leading up to his departure from CDAM on March 3, 2017, which allowed Defendant Sanders to conceal and execute his scheme to destroy CDAM and divert CDAM's business and staff to 5C Capital, of which Sanders is a 50% owner;

(i) failing to comply with the LLC Agreement's requirements imposed upon Sanders in the event of his decision to withdraw from CDAM; and

(j) negotiating and executing a secret agreement with Defendant Marson – the Marson/Sanders Agreement -- which served only the common interest of Marson and Sanders, conflicted with the interest CDAM, and sought to open the door to allow Marson to leave CDAM at will to establish the competing business of 5C Capital, in which Sanders and Marson would be 50-50% owners.

74.  Defendant Sanders's breach of fiduciary duty under the LLC Agreement was done for his own benefit, and the benefit of Defendant 5C Capital which is legally liable for the actions of Sanders under the doctrine of *respondeat superior*.

75.  As a direct and proximate result of Defendant Sanders' tortious conduct, CDAM and Joseph DiMauro were damaged in the amount of the full value of CDAM as a going concern; damage to goodwill and reputation; Sanders' salary and compensation paid during the entire period of the conspiracy (which commenced no later than December 15, 2013); the full value of the funds converted by Sanders; and lost profits of CDAM.  Defendant Sanders' tortious conduct caused irreparable harm to Plaintiffs CDAM and DiMauro, including but not limited to the destruction of CDAM as a going concern.   Plaintiffs seek damages, in an amount to be

determined at trial, but believed to be not less than $10,000,000, including the forfeiture of all compensation paid by CDAM to Sanders from the date of his first act in violation of his fiduciary duties as a co-member of CDAM, which is believed to be no later than December 15, 2013. Plaintiffs also seek attorneys' fees and costs pursuant to Section 8.9 of the LLC Agreement.

76.    Plaintiffs also seek punitive damages under this claim.   Under New York law, punitive damages should be awarded to Plaintiffs CDAM and Joseph DiMauro because Defendants 5C Capital, Sanders and Marson have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM and Joseph DiMauro.  This wrongdoing included a massive fraud on the public.  The evidence at trial will show that Defendants 5C Capital, Sanders and Marson deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.  Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

### SIXTH CLAIM FOR RELIEF

### (Breach of Contract – Marson/Sanders Agreement)

### (Defendant Marson)

77.    Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 76 above.

78.    Defendants Marson and Sanders entered into the Marson/Sanders Agreement, and they back-dated the contract to December 15, 2013.

79.    CDAM has performed all obligations under the Marson/Sanders Agreement.

80. The Marson/Sanders Agreement has been breached by Defendant Marson in several ways:

(a)  Marson agreed to provide services as "Managing Director and Director of Financial Planning for CDAM" until such time the contract is terminated.  Marson did not terminate the contract, but rather, abandoned his duties as "Managing Director and Director of Financial Planning for CDAM" and engaged in a widespread scheme to divert the business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit.

(b)  Marson breached the implied covenant of good faith and fair dealing in the Marson/Sanders Agreement.  Under the covenant of good faith and fair dealing, Marson was obligated to use his "best efforts" in the performance of his duties as "Managing Director and Director of Financial Planning for CDAM."  Moreover, the covenant of good faith and fair dealing embraces a pledge that Marson shall not do anything which will have the effect of destroying or injuring the right of CDAM to receive the fruits of the Marson/Sanders Agreement. Marson breached the contractual covenant of good faith and fair dealing by, *inter alia*:

(i) engaging in a conspiratorial scheme to divert the entire business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit, including through false and deceptive statements in correspondence signed by him;

(ii) secretly establishing and operating a competing business (5C Capital) during the time he was employed by and registered with CDAM;

(iii) failing to use his "best efforts" in the performance of his duties as "Managing Director and Director of Financial Planning for CDAM";

(iv) expending considerable time and effort while employed by CDAM to establish and operate his competing business (5C Capital) and drive CDAM out of business for his own benefit;

(v) causing client files, trade secrets, and confidential and secret information to be taken from CDAM and delivered to him and 5C Capital;

(vi) conspiring to raid CDAM's professional and operations staff to cause a wholesale diversion of the CDAM's professional/operating staff to 5C Capital;

(vii) entering into and concealing a secret back-dated agreement -- the Marson/Sanders Agreement -- without authority; and

(viii) concealing his misconduct by disengaging from the CDAM email system during the time of his employment and through other means.

81.    Defendant Marson's breach of contract was done for his own benefit, and the benefit of Defendant 5C Capital which is legally liable for the actions of Marson under the doctrine of *respondeat superior*.

82.    As a direct and proximate result of Defendant Marson's breach of contract, CDAM was damaged in the amount of the full value of CDAM as a going concern; Marson's salary and compensation paid during the entire period of the conspiracy (which commenced no later than December 15, 2013); and lost profits of CDAM.  Plaintiff CDAM seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000, including forfeiture of all compensation paid by CDAM to Marson from the date of his first act in violation of his breach of contract, which is believed to be no later than December 15, 2013.  Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendant Marson from engaging in or reaping the benefits of his breach of contract.

83.   Plaintiff CDAM also seeks punitive damages under this claim.  Under New York law, punitive damages should be awarded to Plaintiff because Defendant has committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.  This wrongdoing included a massive fraud on the public.  The evidence at trial will show that Defendant deliberately and maliciously sought to destroy CDAM for his own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.  Accordingly, Plaintiff CDAM seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty, Duty of Loyalty, and Duty of Good Faith)

### (Defendant Marson)

84.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 83 above as if fully set forth herein.

85.   In the absence of a contract, the common law of New York law obligates an employee to be loyal to his employer and prohibits the employee from acting in any manner inconsistent with his agency or trust.  The employee is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.  Defendant Marson thus owed fiduciary duties to his employer, CDAM.

86.  Defendant Marson, who was employed by CDAM from 2013 through February 7, 2017, violated his fiduciary duty, duty of loyalty and duty of good faith owed to CDAM by, *inter alia:*

31

(i) engaging in a conspiratorial scheme to divert the entire business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit, including through false and deceptive statements in correspondence signed by him;

(ii) secretly establishing and operating a competing business (5C Capital) during the time he was employed by and registered with CDAM;

(iii) failing to use his "best efforts" in the performance of his duties as "Managing Director and Director of Financial Planning for CDAM";

(iv) expending considerable time and effort while employed by CDAM to establish and operate his competing business (5C Capital) and drive CDAM out of business for his own benefit;

(v) causing client files, trade secrets, and confidential and secret information to be taken from CDAM and delivered to him and 5C Capital;

(vi) conspiring to raid CDAM's professional and operations staff to cause a wholesale diversion of the CDAM's professional/operating staff to 5C Capital;

(vii) entering into and concealing a back-dated agreement -- the Marson/Sanders Agreement -- without authority; and

(viii) concealing his misconduct by disengaging from the CDAM email system during the time of his employment and through other means.

87.   Defendant Marson's breach of common law duties under New York common law was done for his own benefit, and the benefit of Defendant 5C Capital which is legally liable for the actions of Marson under the doctrine of *respondeat superior.*

88.   As a direct and proximate result of Defendant Marson's tortious conduct, CDAM was damaged in the amount of the full value of CDAM as a going concern; Marson's salary and

compensation paid during the entire period of the conspiracy (which commenced no later than December 15, 2013); and lost profits of CDAM. Plaintiff CDAM seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000, including forfeiture of all compensation paid by CDAM to Marson from the date of his first act in violation of his common law duties, which is believed to be no later than December 15, 2013. Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendant Marson from engaging in or reaping the benefits of his tortious acts.

89.   Plaintiff CDAM also seeks punitive damages under this claim. Under New York law, punitive damages should be awarded to Plaintiff because Defendant has committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendant deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it. Accordingly, Plaintiff CDAM seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## EIGHTH CLAIM FOR RELIEF

### (Unfair Competition)

### (Defendants Marson and 5C Capital)

90.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 89 above as if fully set forth herein.

91. Under New York law, where employees, during the period of their employment, and a corporation formed by them, engage in and carry out a conspiracy to compete with the employer, said conduct constitutes actionable unfair competition. As detailed above, Defendant Marson engaged in this very conduct and thus has committed unfair competition under New York law.

92. Defendant Marson's acts of unfair competition were done for his own benefit, and the benefit of Defendant 5C Capital which is legally liable for the actions of Marson under the doctrine of *respondeat superior*.

93. As a direct and proximate result of Defendant Marson's acts of unfair competition, CDAM was damaged in the amount of the full value of CDAM as a going concern; Marson's salary and compensation paid during the entire period of the conspiracy (which commenced no later than December 15, 2013); and lost profits of CDAM. Plaintiff CDAM seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000, including forfeiture of all compensation paid by CDAM to Marson from the date of his first act of unfair competition, which is believed to be no later than December 15, 2013. Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendants from engaging in or reaping the benefits of their acts of unfair competition, and dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

94. Plaintiff CDAM also seeks punitive damages under this claim. Under New York law, punitive damages should be awarded to Plaintiff because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious

acts that willfully and wantonly disregard the rights of CDAM. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendants deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it. Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## NINTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty/ Faithless Servant Doctrine)

### (Defendant Marson)

95.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 94 above as if set forth fully herein.

96.   Under New York law, an employee owes a duty of loyalty to his employer and is prohibited from acting in any manner inconsistent with his or her agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his or her duties. A faithless servant forfeits his right to compensation for services rendered by him. A faithless servant forfeits all compensation earned during the period of his disloyalty even if his services benefited the principal in some part.

97.   Defendant Marson was employed by CDAM from 2013 through February 7, 2017, and during this period of time, owed his employer, CDAM, a duty of loyalty as a faithful servant.

98.   Defendant Marson breached this duty of loyalty by, *inter alia*:

(i) engaging in a conspiratorial scheme to divert the entire business of CDAM to 5C Capital and drive CDAM out of business for his personal benefit, including through false and deceptive statements in correspondence signed by him;

(ii) secretly establishing and operating a competing business (5C Capital) during the time he was employed by and registered with CDAM;

(iii) failing to use his "best efforts" in the performance of his duties as "Managing Director and Director of Financial Planning for CDAM";

(iv) expending considerable time and effort while employed by CDAM to establish and operate his competing business (5C Capital) and drive CDAM out of business for his own benefit;

(v) causing client files, trade secrets, and confidential and secret information to be taken from CDAM and delivered to him and 5C Capital;

(vi) conspiring to raid CDAM's professional and operations staff to cause a wholesale transfer of the CDAM professional/operating staff to 5C Capital;

(vii) entering into and concealing a back-dated agreement -- the Marson/Sanders Agreement -- without authority; and

(viii) concealing his misconduct by disengaging from the CDAM email system during the time of his employment and through other means.

99. Defendant Marson's tortious and faithless conduct was done for his own benefit, and the benefit of Defendant 5C Capital which is legally liable for the actions of Marson under the doctrine of *respondeat superior*.

100. As a direct and proximate result of Defendant Marson's tortious and faithless conduct, CDAM was damaged in the amount of the full value of CDAM as a going concern; Marson's salary and compensation paid during the entire period of the conspiracy (which commenced no later than December 15, 2013); and lost profits of CDAM. Plaintiff CDAM seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000,

including punitive damages and forfeiture of all compensation paid by CDAM to Marson from the date of his first act in violation of his fiduciary duties, which is believed to be no later than December 15, 2013.  Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendants from engaging in or reaping the benefits of their tortious acts, and dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

101.  Plaintiff CDAM also seeks punitive damages under this claim.  Under New York law, punitive damages should be awarded to Plaintiff because Defendants 5C Capital, Sanders and Marson have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.  This wrongdoing included a massive fraud on the public.  The evidence at trial will show that Defendants 5C Capital, Sanders and Marson deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.  Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## TENTH  CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Defendants 5C Capital, Sanders  and Marson)

102.  Plaintiff CDAM repeats and realleges the allegations set forth in Paragraphs 101 above as if fully set forth herein.

103.  In violation of the LLC Agreement, Defendant Sanders inappropriately misappropriated cash and revenues of CDAM through, *inter alia*, direct payments to himself from CDAM's accounts with TD Bank and Chase.

104.  In violation of the Marson/Sanders Agreement, Defendants Sanders and Marson inappropriately misappropriated CDAM's assets, client files, goodwill, and other things of value in the course of their conspiratorial scheme to divert the business of CDAM to 5C Capital and drive CDAM out of business for their personal benefit.

105.  Individual Defendants wrongdoing was done for their own benefit, and also for the benefit of Defendant 5C Capital which is legally liable for the actions of Marson and Sanders under the doctrine of *respondeat superior*.

106.   As a result of Defendants' misappropriation of CDAM's property, Defendants were enriched unjustly.

107.  CDAM was harmed by Defendants' misappropriation.

108.   It is against equity and good conscience to permit Defendants to retain the funds and assets of CDAM, all of which should be returned to Plaintiff CDAM forthwith.


## ELEVENTH  CLAIM FOR RELIEF

### (Slander Per Se)

### (Defendants 5C Capital and Marson)

109.  Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 108 above as if fully set forth herein.

110.   Defendants 5C Capital, Sanders and Marson made oral defamatory statements concerning CDAM, including false statements that CDAM was going out of business, and would continue "rebranded" as 5C Capital.

111.   The defamatory statements are detailed above, including in paragraphs -- which are incorporated herein.

112.   5C Capital is liable in its individual capacity and is liable for the conduct of its employees, including Sanders and Marson, under the doctrine of *respondeat superior*.

113.   While damages need not be alleged or proved upon this claim for relief, the above-detailed defamatory statements caused, and continue to cause, damages, including, without limitation, the destruction of CDAM as an ongoing enterprise.  This damage is an amount to be determined at trial but it is believed to be no less than $10,000,000.

## TWELFTH CLAIM FOR RELIEF

### (Tortious Interference with Business Relations)

### (Defendants 5C Capital and Marson)

114.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 113 above as if fully set forth herein.

115.   Plaintiff CDAM had numerous business relations with real and potential clients.

116.   Defendants' misconduct has interfered with CDAM's business relations.

117.   Defendants acted for a wrongful purpose, used unfair and improper means to interfere with the CDAM's business relations by soliciting the clients of the plaintiff CDAM in addition to disseminating false and malicious statements and other tortious behavior.

118.   The misconduct by Defendants 5C Capital and Marson has interfered with the CDAM to the point CDAM has been deprived of 95% of its business relationships, causing the destruction of CDAM as an ongoing concern.

119.   Plaintiff CDAM has been damaged by the Defendants' tortious interference with business relationships in an amount to be determined at trial. Such damages include, but are not limited to, lost business opportunities, lost profits, direct and consequential damages, and punitive damages resulting from Defendants' misconduct.

### THIRTEENTH CLAIM FOR RELIEF

### (Injurious Falsehood)

### (Defendants 5C Capital and Marson)

120.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 119 above as if fully set forth herein.

121.   Defendants published injurious falsehoods concerning CDAM to CDAM's clients and the public at large.  Defendants knowingly published false matter derogatory to the CDAM's business of a kind calculated to prevent others from dealing with CDAM or otherwise interfering with CDAM's relations with others, to its detriment.

122.   Defendants falsely told CDAM's clients and others, on repeated occasions throughout January and February 2017 (and continuing through today), that:

(i) 5C Capital was the same as CDAM;

(ii) CDAM was to be "rebranded" as 5C Capital;

(iii) CDAM's "advisory business and staff" was moved to 5C Capital;

(iv) 5C Capital was the "consolidation" of CDAM and 5C Capital;

(v) 5C Capital was a "transition" of CDAM to 5C Capital;

(vi)  CDAM would cease operations in its own name and would only continue, in "rebranded" form, as 5C Capital;

(vii)   CDAM's CEO and controlling member, Joseph DiMauro, would be "retiring" from his position as CEO.

(viii)  5C Capital was formed with the approval of CDAM's CEO and controlling member, Joseph DiMauro; and

(ix) It was "necessary" to "consolidate ownership" to "preserve" the advisory business.

123.  Each of the foregoing statements was false, published to third persons (including most notably CDAM's clients and staff), and made with malice (express or implied) in order to destroy CDAM as a going concern and divert the entire advisory business of CDAM to 5C Capital.

124.  As a direct and proximate result of the injurious, actionable falsehoods, CDAM incurred and will prove at trial special damages, including, without limitation, the destruction of CDAM as an ongoing enterprise, lost clients and staff, lost profits, harm to reputation and goodwill, and other damages. Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendants from engaging in or reaping the benefits of their tortious acts, and dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

125.  Plaintiff CDAM also seeks punitive damages under this claim.  Under New York law, punitive damages should be awarded to Plaintiff because Defendants 5C Capital, Sanders and Marson have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil

motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.  This wrongdoing included a massive fraud on the public.  The evidence at trial will show that Defendants deliberately and maliciously sought to destroy CDAM for their own benefit, and made a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.  Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

### FOURTEENTH CLAIM FOR RELIEF

### (Prima Facie Tort)

### (Defendants 5C Capital and Marson)

126. Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 125 above as if fully set forth herein.

127.  The Defendants' wrongdoing was malicious and intended to inflict harm on CDAM.

128. As a direct and proximate result of the malicious misconduct of the Defendants, CDAM incurred and will prove at trial special damages, including, without limitation, the destruction of CDAM as an ongoing enterprise, lost clients and staff, lost profits, harm to reputation and goodwill, and other damages.

129.  Defendants have no excuse or justification for their actions, rather, they maliciously and deliberately engaged in tortious conduct.

130.  Defendants' acts were nothing short of disinterested malevolence, which were intended to and did destroy and harm CDAM.

### FIFTEENTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty)

**(Defendants 5C Capital, Asta, Hunter, McCabe)**

131. Plaintiffs CDAM and DiMauro repeat and reallege each and every allegation in paragraphs 1 through 130 above as if set forth fully herein.

132. Defendants Sanders and Marson breached their respective fiduciary duties to CDAM and Joseph DiMauro. As alleged in paragraphs 70-76 above, Defendant Sanders breached his fiduciary duty to CDAM and Joseph DiMauro under the LLC Agreement. As detailed above in paragraphs 77-83, 84-89, and 95-101, Defendant Marson breached his fiduciary duty, duty of loyalty and duty of good faith to CDAM as an employee, fiduciary and agent of CDAM under the Marson/Sanders Agreement and under New York common law.

133. Upon information and belief, Defendants 5C Capital, Asta, Hunter, McCabe participated in or directed Sanders' and Marson's breaches of fiduciary duty by enabling Defendants' tortious conspiracy, joining Defendant 5C Capital as financial advisors, assisting in the solicitation and diversion of CDAM clients to 5C Capital, and using the client files and other property taken from CDAM to carry out their and 5C Capital's ongoing business.

134. As a direct and proximate result of Defendants' participation in the tortious scheme of Defendants Sanders and Marson, CDAM and DiMauro have been damaged.

135. Defendants 5C Capital, Asta, Hunter and McCabe are jointly and severally liable for the damage caused by the actions of all Defendants herein.

136. The wrongdoing of individual Defendants was done for their own benefit, and for the benefit of Defendant 5C Capital, which is legally liable for the actions of Defendants Asta, Hunter and McCabe under the doctrine of *respondeat superior*.

137. As a direct and proximate result of Defendants' aiding and abetting of tortious conduct, CDAM and Joseph DiMauro were damaged in the amount of the full value of CDAM

as a going concern; Defendants Asta's, Hunter's and McCabe's salary and compensation paid during the entire period of the conspiracy; and lost profits of CDAM. Plaintiffs seek damages in an amount to be determined at trial, but believed to exceed $10,000,000, and forfeiture of all compensation paid by CDAM to Defendants Asta, Hunter and McCabe from the date of their first acts in aiding and abetting Marson's and Sanders' breaches. Plaintiffs seek permanent injunctive relief to enjoin Defendants from engaging in or reaping the benefits of their tortious acts, and dissolution of 5C Capital, under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

138. Plaintiffs also seek punitive damages under this claim. Under New York law, punitive damages should be awarded to Plaintiffs because Defendants committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendants, acting for themselves and 5C Capital, deliberately and maliciously sought to destroy CDAM for their own benefit, and enabled co-Defendants' corrupt and calculated decision that it was cheaper to steal CDAM than pay for it. Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## SIXTEENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations)

### (Defendants 5C Capital, Marson, Asta, Hunter, McCabe)

139. Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 138 above as if set forth fully herein.

140. CDAM entered into valid contracts with its clients.

141. Defendants had knowledge of CDAM's contracts with its clients.

142. Defendants intentionally interfered with CDAM's contracts with its clients.

143. As a direct and proximate result of Defendants' interference, CDAM was damaged in the amount of the full value of CDAM as a going concern; individual Defendants' salary and compensation paid during the entire period of their wrongdoing; and lost profits of CDAM. Plaintiffs seek damages in an amount to be determined at trial, but believed to exceed $10,000,000, and forfeiture of all compensation paid by CDAM to individual Defendants from the date of their first tortious acts. Plaintiff CDAM seeks permanent injunctive relief to enjoin Defendants from engaging in or reaping the benefits of their tortious acts, and dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

144. Plaintiff CDAM also seeks punitive damages under this claim. Under New York law, punitive damages should be awarded to Plaintiff because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM. This wrongdoing included a massive fraud on the public. The evidence at trial will show that Defendants, acting for

themselves and 5C Capital, deliberately and maliciously sought to destroy CDAM for their own benefit, and made or enabled a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.   Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## SEVENTEENTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Business Relations)

### (Defendants 5C Capital, Marson, Asta, Hunter, McCabe)

145.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 144 above as if set forth fully herein.

146.   During all relevant times, CDAM had and maintained business relations with third parties, including CDAM's clients and CDAM's operations staff.

147.   Defendants interfered with the above-specified business relations.

148.   Defendants acted with the sole purpose of harming CDAM or acted through dishonest, unfair, or improper means.

149.   Defendants' actions caused injury to the above-specified business relations, including the destruction of ongoing business relationships between CDAM and its clients and operations staff.

150.   As a direct and proximate result of Defendants' interference, CDAM was damaged in the amount of the full value of CDAM as a going concern; individual Defendants' salary and compensation paid during the entire period of their wrongdoing; and lost profits of CDAM. Plaintiff seeks damages in an amount to be determined at trial, but believed to exceed $10,000,000, and forfeiture of all compensation paid by CDAM to individual Defendants from the date of their first tortious acts.   Plaintiff CDAM seeks permanent injunctive relief to enjoin

Defendants from engaging in or reaping the benefits of their tortious acts, and dissolution of 5C Capital under principles of law and equity to prevent a fraudulent enterprise from conducting affairs in a manner that poses a continuing threat to the public at large.

151.   Plaintiff CDAM also seeks punitive damages under this claim.   Under New York law, punitive damages should be awarded to Plaintiff because Defendants have committed intentional or deliberate wrongdoing. This wrongdoing was accompanied by aggravated or outrageous circumstances, animated by a fraudulent or evil motive, and executed by conscious acts that willfully and wantonly disregard the rights of CDAM.   This wrongdoing included a massive fraud on the public.   The evidence at trial will show that Defendants, acting for themselves and 5C Capital, deliberately and maliciously sought to destroy CDAM for their own benefit, and made or enabled a corrupt and calculated decision that it was cheaper to steal CDAM than pay for it.   Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial, but believed to be not less than $30,000,000.

## EIGHTEENTH CLAIM FOR RELIEF

### (Violation of N.Y. Gen. Bus. Law §§ 349, 350)

### (Defendants 5C Capital and Marson)

152.   Plaintiff CDAM repeats and realleges each and every allegation in paragraphs 1 through 151 above as if set forth fully herein.

153.   Section 349 of the New York General Business Law proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.   Section 350 of the New York General Business Law provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."   These statutes on their face apply to virtually all

economic activity, and their application has been correspondingly broad.   The reach of these statutes provides needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in New York State.   To supplement the authority of the Attorney General, the Legislature created a private right of action to address and remedy deceptive acts in violation of the General Business Law.   See N.Y. Gen. Bus. L. § 349(h).

154.   Defendants have engaged, and continue to engage, in consumer-oriented acts, including soliciting investors, marketing to investors, advertising to consumers, and marketing to the public at large on a widespread scale through the internet.

155.   Defendants' consumer-oriented acts were misleading and deceptive in a material way, including by their misbranding 5C Capital as the successor in interest to CDAM, or the product of a consolidation with CDAM.   No such relationship or affiliation exists.   Defendants' misbranding of itself, suggesting an affiliation with Plaintiff CDAM when no such affiliation exists, is misleading to New York consumers.   It also harms Plaintiff. Indeed, Defendants' deceptive acts caused CDAM's clients and staff to leave CDAM for 5C Capital, causing the destruction of CDAM as a going concern.   Defendants 5C Capital's and Marson's misleading acts are continuing in nature, and are made by public statements that have appeared, and continue to appear, on the website of 5C Capital.   The Defendants' materially misleading acts executed through the 5C Capital website began on or about February 10, 2017, and thus, each day since February 10, 2017, constitutes a separate and independent violation of Sections 349 and 350 of the New York General Business Law.   Accordingly, Defendants have committed dozens of violations of Sections 349 and 350 of the New York General Business Law and continue to commit such violations on a daily basis.

156.    Defendants willfully and knowingly violated Sections 349 and 350 of the New York General Business Law.

157.    Plaintiff CDAM was damaged, and consumers have been misled, by Defendants' violations of Sections 349 and 350 of the New York General Business Law.

158.    Under Section 349(h) of the New York General Business Law, Plaintiff CDAM seeks actual damages, which amount should trebled under the statute, for each daily violation of the GBL.   Plaintiff seeks permanent injunctive relief, including corrective disclosure that 5C Capital is not a rebranded version or successor in interest of CDAM.   Plaintiff seeks statutory damages, and attorneys' fees and costs.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief, to be imposed upon all defendants on a joint and several basis, subject to monetary amounts to be determined at trial:

1.    ON THEIR FIRST CLAIM FOR RELIEF for damages ($10,000,000 or more), statutory damages, attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

2.    ON THEIR SECOND CLAIM FOR RELIEF, for damages ($10,000,000 or more), statutory damages, attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

3.    ON THEIR THIRD CLAIM FOR RELIEF, for damages ($10,000,000), statutory damages, attorneys' fees and costs, permanent injunctive relief (including dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

4. ON THEIR FOURTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

5.  ON THEIR FIFTH CLAIM FOR RELIEF for  damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure), and punitive damages ($30,000,000 or more);

6. ON THEIR SIXTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure), and punitive damages ($30,000,000 or more);

7. ON THEIR SEVENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure), and punitive damages ($30,000,000 or more);

8. ON THEIR EIGHTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

9. ON THEIR NINTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure), and punitive damages ($30,000,000 or more);

10. ON THEIR TENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including dissolution of 5C Capital), replevin of money and assets of CDAM, and punitive damages ($30,000,000 or more);

11.  ON THEIR ELEVENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

12.  ON THEIR TWELFTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

13.  ON THEIR THIRTEENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more);

14.  ON THEIR FOURTEENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more); and

15.  ON THEIR FIFTEENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including dissolution of 5C Capital), and punitive damages ($30,000,000 or more).

16.  ON THEIR SIXTEENTH CLAIM FOR RELIEF for  damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more).

17.  ON THEIR SEVENTEENTH CLAIM FOR RELIEF for damages ($10,000,000 or more), attorneys' fees and costs, permanent injunctive relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more).

18.  ON THEIR EIGHTEENTH CLAIM FOR RELIEF for action damages ($10,000,000 or more), trebled damages, statutory damages, attorneys' fees and costs, permanent injunctive

relief (including corrective disclosure and dissolution of 5C Capital), and punitive damages ($30,000,000 or more).

Together with such other and further relief as this Court deems appropriate.


Dated: Garden City, New York
       July 25, 2017


                              GOLDEN HIRSCHHORN LLP
                              Attorneys for Plaintiff
                              JOSEPH V. DiMAURO

                              By: _____
                                    Lisa M. Golden, Esq.
                                    lmg@ghlawny.com
                              1050 Franklin Avenue – Suite 108
                              Garden City, New York  11530
                              516-307-1616